For the appellee, we have Jan Paul Miller and Stephen Kaufman and Mr. Kaufman, you're for Mr. Mayton or Matton or how does he say his name? Mayton. Mr. Miller, you're for the bank, is that right? Yes. And you've divided your time, I see. Yes. And are you going first, Mr. Miller? I will. Okay. All right. Mr. Semphaw, are you ready to proceed? Yes. All right, you may do so. Thank you. This case concerns the erroneous admission of a group of defendants of extensive evidence of legal gambling in a banking case. This gambling evidence wasn't like some run-of-the-mill evidentiary error like admitting medical records without sufficient foundation or medical treatises as substantive evidence instead of as a basis of expert opinion. Instead, this was playing with fire, and the defendants knew it. There was a motion in Lemonet brought before the trial of this case where Marine Bank acknowledged that admitting such evidence to show a pattern of taking risks was error, but that is precisely what occurred in this case. It was obvious that it would be prejudicial to elicit facts that Frank Vallow was a man who could afford to legally gamble a million dollars a year in Las Vegas. Why else has it been the rule since time immemorial that the wealth of the parties is not admissible? Why else has the United States Supreme Court held that evidence of gambling is not admissible since the 19th century? Yet the defendants stake their entire case on admission of this gambling evidence. They did it in opening, they did it in closing, and sprinkled throughout the testimony. The introduction of this gambling evidence was wrong. Rule 404 makes it crystal clear that propensity evidence is not admissible to show that the party acted in conformity therewith. The Seventh Circuit says that such evidence is categorically inadmissible. But this is precisely what the trial court did. The trial court admitted it. He said about Mr. Kaufman's theory that Mr. Vallow is a known gambler whether it be at the casino or the next real estate transaction or business deal. That's the propensity evidence. The rationale for excluding this evidence is not that it's not relevant, but it is that it's too prejudicial and may over-persuade the jury. The court has said that in many cases, most recently in a civil case, Powell v. Dean Foods. How do we know that this evidence was admitted for an impermissible purpose as opposed to one of the legitimate exceptions? We ask the question, as the Seventh Circuit said in United States Miller, how does the prior bad act, and not that gambling is a bad act, but to many people it is, and it is prejudicial even though it is legal. How does the bad act suggest that the defendant did it again? If the answer is, he intended to do it before, so he must have intended to do it again, then that is the forbidden propensity inference. There was evidence about the decision of the bank not to extend the loans anymore on the hotel, and that based on his income tax returns, they were aware of the amount and extent of his gambling, and that had increased over the years. Would the evidence have been relevant to that issue? No, Your Honor, and that is for several reasons. First off, the fact that at trial, when the defendants were presenting their case in chief, they brought it up as the fifth different reason why it might have been relevant. It was not mentioned in the motions. No, it wasn't mentioned in the motions. It wasn't mentioned when the CEO of the bank testified, Chris Zetic, about that issue, about why the bank loan was not extended. He did not mention it. He said the reason why it wasn't extended was because of a spat, a hallway argument that Mr. Valla and he had gotten into, and he also said because of the fact of the size of the lending relationship. Counsel, was it possibly a response to the character evidence that your client initiated in the case regarding his charitable contributions and things that he did for the community and in the community? No, Your Honor, and I'll tell you why. There is a doctrine which the Supreme Court holds is the doctrine of curative admissibility, and under that doctrine, the other side is only permitted to introduce, is only permitted to introduce evidence where the plaintiff opened the door with... Your client didn't open the door? No, not as to that issue, because clearly the fact that the doctrine of curative admissibility states that it's limited to those situations where its invocation is deemed necessary to eradicate undue prejudicial inferences that might otherwise ensue from the introduction of the original evidence. What was the relevance of that evidence? Of the fact that there was... Charitable acts and all the community organizations. How is that relevant to this case? Why was that even put forth in front of the jury? You know what, Your Honor, I agree with you. It wasn't relevant. The defendants should have objected to that when it came in. They didn't. I know they didn't, and I think they did not object to it for strategic reasons, because they wanted to get in the gambling and they wanted to use that as one more rationale. But I agree with you, Your Honor. I have to confess, I wasn't the trial attorney, and when I looked at that transcript and I saw all that, I was not pleased. I had been on the other side of that. But in any event, that evidence was not on the same subject matter as gambling. And besides that, from a strategic point of view, the fact that it was introduced that Mr. Valla engaged in charitable activities was probably more damaging than it was helpful to the plaintiff, because of the fact that all it went to show is that the plaintiff was wealthy enough that he had money available to give to lots of charities. To many jurors who are struggling to get by, that only made them more enraged, rather than complimentary. So jurors don't like gamblers, but they don't like people that have money, and they don't like people who make charitable contributions. Where does this come from? Is this mythology about the average man? Well, I think... Counsel's speculations about what juries might not like has something to do with jury selection. After that, couldn't you go into a room with 100 people and find lots of folks that say gambling is entertainment? It's greater entertainment, or it has greater consequences for somebody that can't afford to do it. But for somebody that can afford to do it, if they want to gamble, I don't care. Couldn't I find a whole bunch of jurors that would think that way, too? Right, but you also could find a whole bunch of jurors, too, that would think it was improper, sinful, etc. I mean, it is legal, but there are many, many people, jurors, who disapprove of gambling. Why else is casino gambling only recently been made legal? Up until 30 years ago, the only places where it was legal was out in Las Vegas. And so, there is indeed a societal recognition that gambling is problematic. Everybody hates the legislature. If a legislator is the plaintiff or defendant in a lawsuit, do we then assume that the jurors, because we know they're dissatisfied, we can tell that by the newspapers, that that legislator can't get a fair trial, or jurors have to be excluded, or jurors have to be second-guessed after the trial is over, because, well, everybody knows nobody likes a congressman or a legislator. No, but there are limits, and that's, the same limits, that's why since time immemorial, it's been known that the wealth or poverty of the parties is not admissible. I mean, obviously, yes, if you are a legislator, right now, you probably do have a black mark on you, but that's unavoidable, but some of these things, like the wealth of the parties, that's an added mark of dishonor for some jurors. Well, except that the plaintiff wouldn't have been involved in this arrangement, absent personal wealth or personal success. So it's already known to the jury, or they know the bank wouldn't be dealing with it. Well, that's true, but the gambling aspect is above and beyond wealth. I mean, because many people do disapprove of it, it's just a fact of life, and the fact that, and it clearly indicates the wrong inference in this case, which is what the defendants are trying to raise, is that, well, since he's willing to gamble for recreation, he's also willing to gamble at business. And it also means that it gives carte blanche to any defrauder to say, oh, well I can defraud a rich person because of the fact that rich people, by definition, spend a lot of money frivolously, so it doesn't matter. So who cares? Let me ask you something a little more fundamental. Because let's say we agree with you that this gambling evidence should never have come in. On the other side, your client put in evidence about transactions at the bank involving some bank examiner allegations and fraud that was being committed by other people at the bank that were unconnected to this deal with Mr. Ballard. How's that relevant? Why is that coming in? Well, Your Honor, I... And there was a motion in limine filed on that, and Judge Deal denied that one. Judge Deal let everything in. That's exactly my point. So now, I mean, you're asking us to overturn it. If they'd have been in the other position, they'd be asking us to overturn it because you did that. So maybe there wasn't a perfect trial, but was there a fair trial? Everybody got their licks in, and the jury decided. So what are we supposed to do? Your Honor, this court has a role as far as making sure that the judicial system follows rules of evidence. And that was made clear in the Supreme Court case of People v. Lindgren, that, in fact, the appellate courts have a duty to safeguard the integrity of the system. But what about the concept that you can't later complain of something that you played a role in bringing about? Well... I mean, basically, as you said, everything came in, both sides got to throw all the mud they wanted to throw, and now the losing party wants a do-over. The reason for that is because of the Supreme Court's rule about the rule of curative admissibility. The derp, so to speak, has to relate to the same issue, and it has to create undue prejudicial inferences. So, for example, the one case that the defendant cited on that issue of invited error, that case, it was the Werdel v. Terzinski case, where the defendant said in his direct examination that the plaintiff was a crook and a dishonest person. Okay, that was the prejudicial information, and that gave latitude for the other side to call lawyers to indicate that the plaintiff was indeed an upright person. There you had A versus B exactly on the same point. Here, this issue with regard to the bank examiners and the like didn't have anything to do with the plaintiff, Frank Valla's, character. None at all. Now, the issue of his charitable acts did, but that evidence doesn't raise any undue prejudicial inferences because the fact that, as Justice Kinect pointed out, that he's wealthy enough to be able to give to charity doesn't necessarily connote anything. And so it's not the same thing, whereas gambling to many, many, many people and to legislators all across the country except Las Vegas until 30 years ago, was regarded as sinful, illegal. And so that is totally a concept of a different matter as opposed to raising the inferences of charitable activities. I agree it was wrong. Defendants should have objected. They didn't. They strategically refused to object, I think, because of the fact that they wanted to get in the gambling evidence. And that is certainly something that should not be condoned by this Court. Finally, I want to bring up the evidentiary letter of Dr. Tabatai's letter, which is another instance of egregious error. How does that come in? I'll ask them and they get up. I mean, it really was. It was the most blatant hearsay. An incredible violation of the Rule 213 rules. It's Basic Evidence 101. Yes, absolutely. And the trial court just let that in. And I have to confess, it was not raised in the... Preserved, yes. However, we had two claims. We had jury-tried issues and we had court-tried issues. The rule regarding post-trial motions only applies to jury issues. And so it doesn't apply to the court-tried issues of the consumer fraud issues. And furthermore, the issue of... Even though, yes, we have to confess it was waived with regard to the post-trial motion, in the Supreme Court case of Dillon v. Evanston Hospital, the Court made clear that the rule of waiver is not a limitation on the courts. So that even if the parties did waive it, and it wasn't... I have to be honest, it wasn't in the post-trial motion. I know when I was reading that transcript, I told you. But it was raised with regard to the non-jury counts. What does that get you? Ultimately, the jury gave the verdict for the $3,500,000, right? Right. So even if we found that it's okay and it was preserved as to those other counts, how does that help you? Well, because we get a new trial on the consumer fraud counts, that would offset, for sure, the issue on the other counts. So that's why it would be exceedingly helpful to get a new trial on the consumer fraud counts. Because you can't have a more prejudicial letter. And the trial court acknowledged that Blair Fine was the critical core witness to Plaintiff's case. And I failed to understand how he could let that happen. I mean, on the one hand, he could have said, no, witness, you have to come testify. But you can't do both. But make Blair Fine come and testify. Right, exactly. But once the judge rules that the letter is not sufficient to exonerate him from testimony, the court has to be consistent and say, it's not admissible because it's blatant hearsay. How do we know it wasn't just done as a favor? And yet to say that the witness can't tell the truth because of his mental illness, that's devastating to the plaintiff's case. And so for all of the reasons that we've set forth in our brief, we request that this case be set for a new trial in front of a different judge. Thank you. Thank you, counsel. Mr. Miller. May it please the court, good morning. Counsel. For the record, my name is Jan Miller. I represent Marine Bank. I'm sorry for my voice today. I have some allergies. Marine Bank, Marine Bank Corp, Inc., Mark Richardson, and Coyne Richardson. I will start, Your Honor, because Your Honor noted some concern regarding Dr. Tabatabai's letter, so I'll get to the gambling evidence in a minute. Let me put it in full context, just so the record is abundantly clear, regarding how Dr. Tabatabai's letter even got into our hands. It was not, we did not contact Mr. Tabatabai, Dr. Tabatabai. It was not an expert opinion. They were trying to keep fine from having to testify. Exactly. And so, first of all, their initial argument in court was, well, this was a nondisclosure of an expert witness, which I think is ludicrous because, of course, we didn't disclose it as an expert witness. He wasn't our expert witness. They're the ones who went out and got him and dropped this on us five days before the trial was to start. So I don't think that there's any issue regarding disclosure under the disclosure rules. As far as getting it in because it was Dr. Tabatabai's letter, the only reason it would come in, Your Honor, is because Mr. Fine, on the stand, basically took the letter as his own. I didn't seek to introduce the letter until I asked Mr. Fine, did you know this letter went out? Did you see the letter? Did you ask Dr. Tabatabai to send the letter out? Was it sent out on your authority? And do you agree with the information in the letter? So what? It's still hearsay. Well, but, Your Honor, it would be as if at that point, it becomes Mr. Fine's statement. And I don't think the court would have – well, it does. He adopted it. It was basically Dr. Tabatabai acting as his agent, sending the letter in for him. That's what he testified. Mr. Miller, can I just say one thing? Yes, Your Honor. We have you and Mr. Kaufman, who were the trial attorneys. Yes. Mr. Semple was not. All three of you are probably in the top tier of attorneys here in Central Illinois. Thank you. I read the transcript of the trial. For the life of me, in this type of a case, where your evidence was very strong on whether Mr. Valla had exercised good business judgment in the way he approached this deal, why in the world would you and Mr. Kaufman try to dirty this case up with this type of evidence? Clearly, Tabatabai's letter is hearsay. It should never have come into this trial. The gambling evidence. Why? Why do that? You had a good case. Your Honor, let me address them both equally. Frankly, I wasn't planning on introducing Dr. Tabatabai's letter until Mr. Fine took it as his own. Well, you're asking him the questions. He's going to answer you. I wanted to see what he said. Then once he said, I viewed it as basically this is now his statement, and it would be the same as if I had a witness who told me the day before Mr. Fine told him I can't tell the truth because of my medical history. I could have asked him that question, didn't you tell Mr. Smith yesterday that you're worried you can't get a horse again? That was your argument about what his letter said. Yes. I didn't quite read it that way. I think his letter was saying he's severely depressed, he's medicated, he's confused, he can't focus. It will be difficult for him to give accurate testimony. Correct. That's basically what the letter said. I agree, Your Honor. I didn't read it the way you read it necessarily, but regardless. Well, that's why I thought it was admissible at the time, Your Honor. As far as the gambling evidence goes, I want to put that in context as well. Frankly, I mean, if I was the ruler of the universe, this would have been a two-day trial at most. There wouldn't have been any of this bank examiner allegation stuff. There wouldn't have been any gambling evidence. It would have been simply about the hotel. The gambling evidence, however, Your Honor, it was admissible for two reasons. It was admissible for the reason that the bank did not extend the loan, and the reason that wasn't brought up in the motion in Limine, Your Honor, that particular reason, was because, frankly, I can't remember exactly what it was, but sometime between the motion in Limine and the start of trial, it became clear to me that attacking the validity of the bank's decision to stop the loan was going to be part of their case, and that was clear in the opening statement when they started talking about more and more what a great customer he was and he never missed a payment and all that sort of thing. Can I ask you another question? Yes. How was that evidence that the bank was going to send him elsewhere and not extend the loan anymore relevant to whether he was defrauded at the initial transaction? Well, because one of his claims was that we had promised, he pled this in the complaint, one of the fraudulent claims was we had promised to extend the loan until the hotel was profitable again, which obviously we didn't do, and we said, no, you can't have it. You can't have the loan anymore. We're not going to extend it anymore. So because of that claim, it was directly relevant to just the factual scenario that the bank was faced with and the claims that we were having to defend against. That's really, I think, the only reason it was relevant to the case. But for some reason, and I don't know why, even through the appellate briefs that are before this panel, the plaintiff is still claiming that there was no economic reason to end the loan. I agree with you as far as whether he was defrauded or not as to all of his other claims. That's irrelevant. For some reason, the plaintiff made that a major point in their case, and therefore bringing in all the reasons that the bank considered in asking him to move his business was there in order to rebut that information. And the gambling was clearly part of it. Nobody advanced that as a reason in the motion to eliminate it. No, Your Honor, as I said, because sometime between the motion to eliminate and as we were getting ready for trial, and I don't remember when it was or what it was they concluded me in, it might have been an argument in the motion to eliminate on other motions. I don't remember. But as I said, it became clear to me that that was going to be a point they were going to be raising and trying to make a lot of hay out of the trial. Mr. Miller, wasn't it you that said to the trial court, if we were trying to get this evidence in to show risk-taking, I agree with you, it wouldn't be admissible? I did say that. I went on to say, however, Your Honor, that, Judge, if you're going to win in all of this bank-examining stuff, if you're going to allow this, I didn't put it this way, but basically if you're going to allow a free-for-all. You basically did put it that way. Then we want to put in this gambling stuff, and he let you. How is that right? Well, Your Honor, first of all, I want to say that, I want to point out that the extent that the gambling evidence was discussed is greatly exaggerated in the appellate briefs. And what I said about the gambling evidence was strictly about materiality and the reason that the bank dropped the loan. But Mr. Coffman, in his opening statement, the first words out of his mouth are about gambling. I agree, Your Honor, and that's why there should have been a request for a limiting instruction. Because that would have been, because the gambling evidence was appropriate and relevant as to two issues, the materiality of the alleged $63,000 overpayment, and because of the reasoning, part of the reasoning that the bank let, or asked Mr. Cavallo to take his business elsewhere. It was relevant for those two reasons. It was, therefore, incumbent upon the plaintiff to ask for a limiting instruction. Now, counsel was making reference to strategic decisions, and I'm not going to agree that we made a strategic decision to let him go on with this terrible stuff because we wanted to get the bank out of this, and that's actually not the case. But strategic decisions are made at trial, and you're stuck with them. And, you know, trial lawyers all the time. I know I've decided not to ask for a limiting instruction when I've been entitled to one because I don't want to have the extra flag being waved, singling out that evidence to point the jury's attention to it even more. I presume that's the decision that was made in this case by trial counsel for plaintiffs, is that they decided they didn't just let it go as quickly as possible, don't have the judge calling attention to that evidence again. But if you decide not to do that, then you're stuck with the consequences at the end. And so, really, I think, Your Honor, the proper ruling, in my opinion, or the proper way this would have gone had that tactical decision been better, I think it would have been proper to have the gambling evidence in to rebut the claim that we were throwing him out of the door for no reason at all, and because of the materiality or lack thereof of the $63,000 difference, and to have a limiting instruction proposed by plaintiffs. I think that would have been in conformity with every rule of evidence, Your Honor. You don't think that's a prejudice of showing that Mr. Fowler was gambling up to a million dollars at least a year to show that $63,000 difference was inconsequential to him didn't bring prejudicial evidence into the case? Well, no, Your Honor. I mean, I asked Mr. Fowler at his deposition, I specifically asked him about one of the years when he had, I think, a $200,000 loss, and I asked him, is that a significant amount of money? It's $327,000, but whatever. Is that a significant amount of money to you? And he said, no, it's not. At the same time, he's claiming that the bank defrauded him and that he relied on a number of $1.75 million, when his own expert says it should have been $63,000 less than that, and claiming that that was a material misstatement, that if he had known otherwise, he wouldn't have bought the hotel. So I think when you have, on the one hand, the man saying hundreds of thousands of dollars is, no, that is not a substantial amount to me, but it is a substantial material amount because you lied to me about the cost, I think that is an argument we can make. In other words, you lied to me? You mean, allegedly, you lied to me? I mean, are you saying that basically, because this isn't a significant amount of money to this person, that you can cheat them out of that in a business deal? No, Your Honor. I'm not suggesting that at all. What I am suggesting, however, is whether the quote-unquote misstatement is, which obviously we deny that there was any such misstatement here, but taking Mr. Valla's claim as he laid it out, if one were to assume that the jury is going to look at that, it's then a jury question as to whether not only did he rely on the statement, but was it a misstatement of material fact? And we could look at, you know, where the line could be drawn in the amount of money, there is no bright line. If it was 50 cents, if instead of $1.75 million, it was $1.75 million minus 50 cents, I seriously doubt any jury would find that that was a material misstatement, even if it was knowingly made. $63,000, they might find it as a material misstatement in spite of what Mr. Valla said, but on the other hand, they might not. So it goes to the particular facts of this case, and I don't think there is a bright line that can be drawn. I'm certainly not suggesting, as counsel seems to argue, that the argument was, well, if the man is wealthy, then you can defraud him of whatever you want to defraud him about. I do want to, by the way, make one point about the whole wealth argument. Two points, actually. Number one, this is brought up for the first time actually in the reply brief. There was no argument below that the gambling evidence was prejudicial because it showed Mr. Valla was wealthy. I don't think it was in their opening brief either. It was in the reply brief. So that's the first time this argument is coming up. And then as Justice Pope pointed out, again, that was an issue that was laid out on the table before I ever or Mr. Kaufman ever opened his mouth in the courtroom through the opening statement, not only through the charitable contributions, but talking about the multimillion dollar business that Mr. Valla grew and the tens of millions of dollars of business he had done with the bank over the years. So it was a given. Everybody knew, based on the information put forward by plaintiffs, that Mr. Valla was a man of means. There was no additional potential prejudice that came from that. Your Honors, I think going back to something that Justice Pope mentioned a few minutes ago, I recognize, and I'm not going to stand here and pretend that this was a casebook trial as far as how evidence should be done and how a trial should be run. However, as Your Honor alluded to, we need fair trials. We don't need perfect trials. We would all strive for a perfect trial. Unfortunately, we don't always get those. And the question is, was this a fair trial? Was the ultimate decision of the jury and the court against the weight of the evidence? Was it something that a reasonable jury, taking out this other evidence that is allegedly and improperly, shouldn't have gotten to? And the answer, obviously, is no. The main problem with the plaintiff's case here was, frankly, the plaintiff in his own testimony. I'm not going to belabor it. Actually, Mr. Coffman goes into it a great deal, I think quite well in his brief. But the jury was aware that Mr. Valla changed his story several times, even in the complaints leading up to trial. That was all laid out to the jury. He was impeached numerous times on very important matters in front of the jury in his own testimony. He was impeached by his deposition testimony while he was sitting on the stand. He admitted that, on the one hand, he knew that the Collier appraisal, which was over two years old, that the hotel was no longer worth what the Collier appraisal said because of the loss of goodwill, etc., etc. But then, in the same breath, he's saying, yes, but I relied on the Collier appraisal of $3.3 million in buying the hotel. There's no way to jive those two things in front of the jury. It was clear that the other two appraisals that he complained about didn't even exist when he signed the contract to buy the hotel. One of them didn't even exist when the hotel deal was actually closed. And finally, and perhaps most importantly, and this is what I spent my entire closing argument doing, in fact, my closing argument was an hour long, 55 pages, I mentioned the gambling evidence not once in my entire closing argument. The word gambling, casino, Vegas, never came out of my mouth in closing argument. What I did argue was the fact that Mr. Valla's story did not line up with his own witness, Mr. Fine, with the chronology that Mr. Fine laid out and Mr. Valla laid out. They were completely incompatible, and his story was contradicted by contemporaneous documentation that existed back in the day when the deal was actually going down. So, I recognize your honor's consternation regarding some of the things that went on in trial, but at the end of the day, the jury and the judge came to the right decision. And at the end of the day, although there was, Mr. Maton was forced to take the Fifth Amendment about things that had nothing to do with this case, and we had to do witness after witness after witness about loans that had nothing to do with this case. Regardless of all of that, the jury was given the appropriate information about the deal at hand, and they saw Mr. Valla, they were able to hear his various stories, they were able to match it up with his other witness, and they were able to look at the documentary evidence, and they came to the right conclusion. So, even if this court has some concern about how we got there, the ultimate ruling of both the court and the jury was the appropriate finding and should not be disturbed by this court, unless the court has any further questions. Thank you, Mr. Miller. Thank you. Mr. Kaufman? May it please the court, I'm Steve Kaufman, I represent Phillip Maton in this matter. I'd like to make three quick points for the benefit of the court. First of all, while we don't admit that the trial judge made an error with regard to the gambling evidence, what's very important is that it was basically harmless error. There was overwhelming evidence against plaintiff's cause of action for fraud, and bear in mind, of course, he had the burden of proof by clear and convincing evidence. We brought out in trial that he, in making a purchase of a $1.75 million motel, failed to inspect the property in the daylight. As a matter of fact, he went through it one time with a flashlight. He failed to hire a building inspector. He failed to hire an appraiser. He failed to consult an attorney or a CPA concerning that transaction. He didn't hire a hotel management company. He allowed his inexperienced family to manage the hotel. He invested in a business he knew nothing about. He failed to pursue a hotel or a motel flag like Ramada or Holiday Inn, and he failed to insist upon an itemization of costs by the bank. So there was overwhelming evidence that he did not reasonably rely upon any alleged statements by my client or anybody from the bank. The second point I want to make is that it took him eight years to file suit after being allegedly defrauded about this transaction. I've been involved in lots of fraud cases in my career. Typically, fraud is recognized immediately, and something is done about it. He waited eight years before he filed his fraud count, and it happened shortly after Marine Bank told him to go find another bank for his future banking needs because his business was having trouble being paid by the state, and they recognized the gambling issues in his tax returns. So, Mr. Kaufman, you paint the picture. I think your jury probably would have seen that. Why risk everything with the gambling evidence? And you start out your closing argument with gambling. You don't really know, Judge. Well, keep in mind, too, the scenario of the opening statements. The plaintiff in his opening statement, which went on 45 minutes or an hour by recollection, covered charitable contributions so much that I actually put my pen down and stopped keeping notes. Charitable contribution after charitable contribution, and spent a tremendous amount of time trashing Mr. Mayton. Okay, but he knows at that point that the gambling evidence is coming in because the court already denied the motion to deliver. So I think, probably, the thought was, we have to have this off the pass. They're going to paint him as a gambler. We need to show he's not just, that's not just his sum of substance. So they knew ahead of time, assuming that's why they went into all that detail. And, you know, you never know how the evidence is going to play out at court at all. And so he knew gambling was coming in. We knew gambling was coming in. And we introduced that concept in opening statement, and it was covered somewhat throughout trial. I would take exception to plaintiff's argument that we staked our entire case on gambling. That was not true whatsoever, Your Honor. This was a two-week trial. We staked our case on the total lack of credibility of plaintiff's testimony and the lack of proof that he'd been frauded or damaged because of any alleged fraud. I took pity on you because you only had three minutes. So I only asked one question, but you're out of time. Thank you, Your Honor. Sorry, Mr. Kaufman. And I would only ask that this court affirm the jury verdict and the verdict of the judge and that this case come to a conclusion. Thank you. Thank you. Ms. Gastapoff, do you have a rebuttal? Briefly. Just to correct some misstatements. Plaintiff did not initiate bringing forth this letter that Dr. Tabatai wrote. This letter was voluntary. Plaintiff subpoenaed Dr. Tabatai as a witness to testify at trial. He was met with this letter, unsolicited letter, from this doctor. And so plaintiff's counsel reaction to that was to ask the court to allow the evidence deposition to be read. The court denied it. Plaintiff certainly did not initiate this letter or didn't bring it forth. It was done in spite of his request. With regard to the issue of extending the loan being an issue not known before trial, that is disingenuous. That was part of count five of plaintiff's complaint. Defense counsel certainly knew that at the time of the motions in limine. So to suggest that they had no idea that the lack of an economic rationale was going to be brought up for extending the loan is a misnomer. With regard to the issue of a limiting instruction, defense counsel admits that that would have been far more damaging than nothing at all. In fact, the rule is, as the Supreme Court said, that even relevant evidence should not be admitted if the proven value outweighs, substantially outweighs, if the prejudicial value substantially outweighs the proven evidence. Here, because there were three witnesses on extending the loan, Craig Miles, CEO Zedek, and Mark Richardson, and Mark Richardson only mentioned the gambling as one of several reasons. The evidentiary weight of the gambling was far less significant than the prejudicial impact. With regard to the issue of... Before you go on with that, I don't understand why a limiting instruction wouldn't have been at least somewhat helpful. Because of the fact that it would emphasize again that the court would be giving judicial recognition to the fact... The court already gave judicial recognition. Well, that is true. But I mean, the jury didn't know that just because of the fact that it was done by motion and limine. And with regard to the other objections, there was a continuing objection. So it really wasn't brought out in front of the jury that the plaintiffs contended that this was inadmissible because of the way the court handled the objections. It was done by a continuing objection. And it was done in sidebars. And so the jury wasn't really informed that there was a big issue as to the admissibility of this gambling. So it was. I also want to mention with regard to the issue of whether it was reversible error or not. The Supreme Court clearly states that there is a different rule of reversible error when bad acts evidence is introduced than when normal evidentiary error is. And in fact, basically what the Supreme Court said in People v. Lindgren is that erroneous admission of the bad acts evidence ordinarily calls for reversal. And only if the record affirmatively shows that the error was not prejudicial will it be deemed harmless. And again, in People v. Robinson, only if the properly admitted evidence is so overwhelming that no fair-minded fact-finder could have acquitted the defendant should the error be overlooked. Here, the fact that summary judgment was denied, the trial court denied motions for directed verdict, there was indeed evidence that misrepresentations were made. You can't say the evidence was so overwhelming that no fact-finder could find in favor of it. Therefore, under People v. Robinson and People v. Lindgren, the argument was reversible. Thank you. Thank you, counsel. We'll take this matter under advisement and stand in recess until our next case.